## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

*In re* **C.J.-1, C.J.-2, C.J.-3, and R.J.**

**No. 21-0361** (Harrison County 20-JA-218-2, 20-JA-219-2, 20-JA-220-2, and 20-JA-221-2)

## MEMORANDUM DECISION

Petitioner Father J.J. Jr., by counsel Phillip S. Isner, appeals the Circuit Court of Harrison County's April 5, 2021, order terminating his parental rights to C.J.-1, C.J.-2, C.J.-3, and R.J.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and James Wegman, filed a response in support of the circuit court's order and a supplemental appendix. The guardian ad litem, Dreama D. Sinkkanen, filed a response on behalf of the children also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in (1) adjudicating him as an abusing parent, (2) failing to enter an adjudicatory order, and (3) terminating his parental rights without first granting him an improvement period and when no party had filed a motion to terminate his parental rights.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In November of 2020, the DHHR filed a child abuse and neglect petition against petitioner due to allegations of physical abuse against then-twelve-year-old C.J.-3. Specifically, the DHHR

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Because three of the children share the same initials, we will refer to them as C.J.-1, C.J.-2, and C.J.-3, respectively, throughout the memorandum decision.

1

alleged that petitioner had weekend visitation with his children, C.J.-1, C.J.-2, and C.J.-3, and that, after the children returned to their mother's care, the mother observed a handprint on C.J.-3's face and neck and bruising on his back and buttocks.[2] The child reported that petitioner smacked him with a belt on the back and buttocks after he refused to eat dinner and then, after he began crying, slapped him in the face/neck area. The mother obtained a domestic violence protective order against petitioner as a result. C.J.-3 underwent a forensic interview at the local Child Advocacy Center ("CAC") and made consistent disclosures of being smacked with a belt and slapped in the face. A Child Protective Services ("CPS") worker spoke to petitioner, who reported that he "busted [C.J.-3] with the belt" about an hour before the child returned home to his mother. Petitioner denied that he caused the marks on the child and stated that C.J.-3 "barely shed a tear." Petitioner denied slapping the child and surmised that he must have sustained the marks and bruising due to roughhousing with his older brothers. Subsequently, petitioner was arrested and charged with child abuse resulting in injury. The DHHR concluded that petitioner physically abused C.J.-3 and subjected the children to unsafe conditions.

The circuit court held an adjudicatory hearing in December of 2020. The DHHR called several witnesses, including Deputy Chase Barnett of the Harrison County Sheriff's Office, who testified that he investigated a complaint of child abuse called in by C.J.-3's mother. Deputy Barnett said that he responded to the mother's home, and that she reported that, soon after the children arrived home from spending the weekend with petitioner, she noticed a handprint on C.J.-3's face and neck. Deputy Barnett also observed the handprint and took several pictures, which the DHHR entered into evidence. According to Deputy Barnett, the child reported that petitioner slapped him after he told petitioner that he did not want to eat the dinner prepared by his stepmother. After Deputy Barnett left the mother's home, she reported that she had also discovered bruising on C.J.-3's back, buttocks, and hip. Deputy Barnett responded to the home, observed the bruising, and took pictures of the same; those pictures were also entered into evidence. Deputy Barnett testified that, after conducting his investigation, he charged petitioner with felony child abuse causing injury.

Patty Saunders, a CAC forensic interviewer, testified that she interviewed C.J.-1, C.J.-2, and C.J.-3 regarding the allegations of abuse. Ms. Saunders testified that, during his interview, C.J.-3 disclosed that he was a picky eater and refused to eat the meal made by his stepmother while visiting petitioner one weekend. C.J.-3 reported that petitioner became angry and smacked C.J.-3 with a belt on his buttocks, back, and hip and slapped him in the face. The child reported that he had been "whooped" on occasion but that it had never left a mark before.

The mother of C.J.-1, C.J.-2, and C.J.-3 testified in this matter as follows: She and petitioner had a visitation schedule pursuant to a family court order, with petitioner receiving weekend visits every other weekend. The children often came home on Sunday in the same clothes they were wearing on Friday and were dirty. When the children arrived home from petitioner's home on the weekend of the incident at issue, she observed a handprint on C.J.-3's face and neck. C.J.-3 reported that petitioner hit him after he refused to eat a meal cooked by his stepmother. The mother immediately called the police to file a report. Several hours later, after the child had

---

[2]R.J, the fourth child named in this petition, is petitioner's child from another relationship. R.J. lived with his mother (petitioner's wife) and petitioner.

showered, she observed bruising to the child's back. Upon questioning the child further, C.J.-3 reported that when he refused to eat the meal, petitioner hit him three times with a belt, and, when he was crying "too loud" from getting hit with the belt, petitioner slapped him in the face/neck. Finally, the mother testified that she called law enforcement a second time to report the child's additional disclosures and that, since that incident, C.J.-3 has refused to visit with petitioner.

At the close of the hearing, the circuit court adjudicated petitioner as an abusing parent. The court noted that petitioner's decision to not testify in his defense "could be used as a negative inference with regard to the evidence" and found that the evidence demonstrated that petitioner intentionally inflicted physical, mental, and emotional injury on the child. The circuit court stated that, "given the very graphic pictures that have been made part of the record of this proceeding, this is far more than corporal punishment and far more in the [c]ourt's opinion than excessive corporal punishment. This is . . . a physical assault on this child, this 12-year-old, by an adult." C.J.-3 was adjudicated as an abused child, and, by virtue of being in the same home, the other three children were also found to be abused and neglected.

In February of 2021, the circuit court held a dispositional hearing. Petitioner testified and admitted that he had a pending unrelated criminal matter for failing to pay child support. Petitioner stated that, earlier that month, his deferred adjudication in the child support matter was revoked due to the allegation of abuse and neglect against him. Petitioner was ultimately sentenced to one to three years of incarceration for his failure to pay child support and was required to self-report to North Central Regional Jail in March of 2021 to begin that sentence. Regarding the instant proceedings, petitioner denied that he intentionally hurt the child. Petitioner admitted that he "busted [C.J.-3's] butt" but denied that he hit the child on the neck, surmising that the mark on the child's neck must have come from wrestling with his brothers. However, petitioner acknowledged that he caused injury to the child and, after participating in parenting classes, learned that there were better ways to discipline his children. Petitioner requested an improvement period, stating that he was willing to learn how to be a better parent.

The mother of C.J.-1, C.J.-2, and C.J.-3 testified that the incident giving rise to the petition was not petitioner's first act of violence. The mother indicated that petitioner had been granted parenting classes in the past and she did not "see where, you know, giving him second chances after second chances is beneficial for the children."[3] The mother testified that she believed the injury to the child was intentional, and not an accident, and that a parent should not use that much force on a child. As such, she stated her desire that petitioner's parental rights be terminated.

Dr. Edward Baker, a clinical psychologist, testified regarding the psychological evaluation he performed on petitioner. Dr. Baker stated that, during petitioner's evaluation, petitioner's answers were "fairly defensive in the sense that [he] didn't want to admit to having any kind of personal problems or concerns." Further, petitioner's "validity scales are highly elevated, indicating that he was not forthright about his responses" and believed he had no "problems" in parenting. Dr. Baker opined that petitioner had "narcissistic traits" and that, usually, such

---

[3]It appears that petitioner was involved in a prior abuse and neglect proceeding wherein he was granted a preadjudicatory improvement period, which he successfully completed, and the matter was dismissed without reaching the adjudicatory stage.

individuals "are not necessarily willing to admit to having any problems or concerns and tend to see the people around them as having the problem rather than themselves." Dr. Baker stated that petitioner denied causing injury to the child and that "the photos [of] the injuries seemed significant, [and] that if [petitioner] was the person who caused those injuries then it appeared that he minimized his culpability in those injuries." According to Dr. Baker, petitioner also minimized his need for parenting and adult life skills classes and did not appear to be getting a substantial benefit from services. Dr. Baker testified that petitioner was "not taking [the classes] seriously . . . he was going through the motions" and that "when [petitioner] got tired the [service provider] would leave and [petitioner] would go back to playing video games. That was how [petitioner] characterized it." Dr. Baker gave petitioner a guarded prognosis for attaining minimally adequate parenting.

A CPS worker testified that the DHHR recommended that petitioner not be granted an improvement period. According to the worker, petitioner failed to accept responsibility for C.J.-3's injuries, blamed the injuries on the child's siblings, and was set to be incarcerated within a few days of the hearing. The worker further testified that the DHHR recommended that petitioner's parental rights be terminated, explaining that up until the hearing, petitioner had maintained that he had not caused the child's injuries. Regarding petitioner's testimony that he caused an injury to the child, the worker opined that petitioner "had a change of heart overnight," insinuating that petitioner did not truly accept responsibility for his actions.

R.J.'s mother testified that she did not believe that the termination of petitioner's parental rights was in then-five-year-old R.J.'s best interests. The mother reported that R.J. "cries hi[m]self to sleep every night because he misses [petitioner] and can't talk to him at all." The mother further reported that the child was having issues with school due to not being able to see petitioner. According to the mother, R.J. had a strong bond with petitioner, and the mother believed that, with time, petitioner could work on his anger management issues.

By order entered on April 5, 2021, the circuit court denied petitioner an improvement period and terminated his parental rights to all four children. The circuit court found that petitioner failed to accept responsibility for the physical abuse he inflicted on C.J.-3, denied hitting the child in the neck/face, and blamed his other children for the injuries C.J.-3 sustained. Although petitioner was participating in services, the circuit court found that petitioner did not take the classes seriously and did not appreciate or acknowledge the wrongfulness of his actions, which posed a barrier to him making any progress in services. Further, petitioner was unable to continue to participate in services given that he was to self-report to jail on March 1, 2021, to serve one to three years of incarceration for failure to pay child support. As such, the circuit court concluded that there was no reasonable likelihood that petitioner could correct the conditions of abuse and neglect in the near future and that termination was necessary for the children's welfare. Petitioner appeals the circuit court's April 5, 2021, dispositional order.[4]

The Court has previously established the following standard of review in cases such as this:

---

[4]The mothers were deemed nonabusing parents, and the permanency plan for the children is to remain in their respective mother's care.

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner first argues that the circuit court erred in adjudicating him as an abusing parent. According to petitioner, the DHHR failed to present sufficient evidence to make a finding that petitioner abused or neglected the children. Petitioner contends that Deputy Barnett's testimony demonstrated that he only briefly spoke to C.J.-3 when he arrived to take the mother's complaint and that C.J.-3 was not in pain; the officer further noted that this appeared to be a one-time incident. Petitioner calls into question the mother's reports of bruising to C.J.-3's buttocks, as that report was made hours after she reported bruising to his neck and claims the only other evidence presented was hearsay reported by the children during their CAC interviews. Petitioner avers that no substantive evidence was presented other than C.J.-3 stating that he was spanked and slapped and the other children reporting overhearing the altercation. Essentially, petitioner avers that the evidence was that C.J.-3 had some bruising on his buttocks and neck from a single incident. Petitioner contends that, even if considered as excessive corporal punishment, a single incident of this degree that required no medical attention does not rise to the level of abuse and neglect. We disagree.

This Court has previously held that

[a]t the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected . . . . The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence.

*In re F.S.*, 233 W. Va. 538, 544, 759 S.E.2d 769, 775 (2014). This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *Id*. at 546, 759 S.E.2d at 777 (citation omitted). However, "the clear and convincing standard is 'intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.'" *Id.* (citation omitted). Further, West Virginia Code § 49-1-201 defines "abused child" as

[a] child whose health or welfare is being harmed or threatened by . . . [a] parent . . . who knowingly or intentionally inflicts, attempts to inflict, or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home.

Here, we find that sufficient evidence existed to adjudicate petitioner as an abusing parent. Contrary to petitioner's claims, both Deputy Barnett and the children's mother testified to observing bruising to C.J.-3's face/neck, back, buttocks, and hip. Deputy Barnett took pictures of the child's injuries, which were submitted into evidence. Both the mother and the forensic interviewer testified regarding C.J.-3's consistent disclosures that petitioner first smacked the child on the buttocks, back, and hip with a belt for refusing to eat dinner, and then slapped him in the face when he cried too loudly as a result of the belt spanking. In viewing the photographs of the child's injuries, the circuit court described them as "graphic" and concluded that petitioner's actions exceeded corporal punishment, were "far more" than excessive corporal punishment, and were to such an extent as to be considered a physical assault on the child. Further, petitioner did not testify at the adjudicatory hearing, and the circuit court made a negative inference in that regard.

> Because the purpose of an abuse and neglect proceeding is remedial, where the parent or guardian fails to respond to probative evidence offered against him/her during the course of an abuse and neglect proceeding, a lower court may properly consider that individual's silence as affirmative evidence of that individual's culpability.

Syl. Pt. 2, *W. Va. Dep't of Health & Human Res. ex rel. Wright v. Doris S.*, 197 W. Va. 489, 475 S.E.2d 865 (1996). Based on the foregoing, we find no error in the circuit court's adjudication of petitioner as an abusing parent.

Petitioner also briefly argues that the circuit court erred by not entering an adjudicatory order in this matter. Rule 27 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings provides that

> [a]t the conclusion of the adjudicatory hearing, the court shall make findings of fact and conclusions of law, in writing or on the record, as to whether the child is abused and/or neglected in accordance with W. Va. Code § 49-4-601(i). The court shall enter an order of adjudication, including findings of fact and conclusions of law, within ten (10) days of the conclusion of the hearing, and the parties and all other persons entitled to notice and the right to be heard shall be given notice of the entry of this order.

Petitioner is correct: the circuit court did not enter an adjudicatory order within ten days of the adjudicatory hearing as required by Rule 27. Regardless, this error does not entitle Petitioner to relief. Petitioner contends that the lack of an order of adjudication has prejudiced his ability to pursue this appeal; that is, Petitioner contends that he cannot argue the adjudication was in error if he cannot point to specific findings in doing so. But Petitioner's own briefing belies that position. Petitioner has brought detailed (if unavailing) arguments against the circuit court's adjudication

6

decision predicated on nuances in the testimony of two witnesses, Deputy Barnett and the mother. Those pointed arguments demonstrate no uncertainty as to the grounds for the circuit court's decision to adjudicate him as an abusing parent. Moreover, Petitioner did not affirmatively argue below, nor does he argue now, that he has *ever* lacked an understanding of the court's rationale at adjudication or the effect of its findings and conclusions made on the record at the adjudicatory hearing. For those reasons—and in view of the findings and conclusions spread on the record by the circuit court at the end of the adjudicatory hearing—petitioner has not established that this error entitles him to relief.

Petitioner next argues that the circuit court erred in terminating his parental rights without first granting him an improvement period. Petitioner contends that his testimony demonstrated that he acknowledged causing injury to the child and that he would comply with any terms and conditions of an improvement period. He also points to Dr. Baker's testimony that petitioner had the ability to improve his parenting and could make significant progress with six months of services. Dr. Baker further testified that, even if petitioner served a year in prison, the children would not be harmed by the delay in providing petitioner with services following his release. As such, petitioner asserts that the circuit court erred in terminating his parental rights.

The decision to grant or deny an improvement period rests in the sound discretion of the circuit court. *See In re M.M.*, 236 W. Va. 108, 115, 778 S.E.2d 338, 345 (2015) ("West Virginia law allows the circuit court discretion in deciding whether to grant a parent an improvement period."); Syl. Pt. 6, in part, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996) ("It is within the court's discretion to grant an improvement period within the applicable statutory requirements[.]"). We have also held that a parent's "entitlement to an improvement period is conditioned upon the ability of the [parent] to demonstrate 'by clear and convincing evidence that the respondent is likely to fully participate in the improvement period.'" *In re Charity H.*, 215 W. Va. 208, 215, 599 S.E.2d 631, 638 (2004). However, the circuit court has discretion to deny an improvement period when no improvement is likely. *See In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002). Further, we have previously held that

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted).

Contrary to petitioner's argument, we see no error in the circuit court's determination that he was not likely to fully participate in an improvement period. The circuit court found that petitioner failed to accept responsibility for his actions against C.J.-3. While petitioner argues that he acknowledged causing the injury, petitioner continued to maintain during his testimony at the dispositional hearing that he did not slap the child in the face and blamed that injury on the child's siblings. Further, the circuit court found that petitioner did not take the services he was provided seriously and did not acknowledge or appreciate the wrongfulness of his actions. Although petitioner argues that delaying his improvement period until after his release from incarceration

7

would not have negatively impacted the children, we note that Rule 5 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings sets forth that "[u]nder no circumstances shall a child abuse and neglect proceeding be delayed pending the initiation, investigation, prosecution, or resolution of any other proceeding, including, but not limited to, criminal proceedings." Moreover, petitioner is not guaranteed release after one year, and, in fact, he was still awaiting trial for his charge of felony child abuse causing injury, which could result in an additional sentence of one to five years of incarceration. Given petitioner's failure to accept responsibility for his actions, coupled with his inability to participate in services due to his incarceration, we find that the circuit court did not abuse its discretion in denying petitioner an improvement period.

The evidence as set forth above likewise supports the termination of petitioner's parental rights. West Virginia Code § 49-4-604(c)(6) provides that circuit courts are to terminate parental rights upon finding that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the children's welfare. West Virginia Code § 49-4-604(d) provides that a circuit court may find that there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected when the abusing parent has "demonstrated an inadequate capacity to solve the problems of abuse or neglect on [his or her] own or with help."

The record establishes that petitioner demonstrated an inadequate capacity to solve the problems of abuse or neglect on his own or with help. As noted above, petitioner was provided services, such as parenting and adult life skills classes, but failed to take them seriously or benefit from them. During his psychological evaluation, which occurred only three weeks prior to the dispositional hearing, petitioner claimed he had "no clue" what the purpose of his services were and that, essentially, he was just waiting on the service provider to leave so that he could resume playing his video games. While petitioner testified at the dispositional hearing that he caused injury to the child, he refused to admit slapping the child in the neck, and the CPS worker expressed her disbelief in petitioner's sudden change of heart. Moreover, the mother of C.J.-1, C.J.-2, and C.J.-3 testified that termination would be in the children's best interests and that C.J.-3 had no desire to visit with petitioner. Finally, to the extent petitioner claims he should have been granted a post-adjudicatory improvement period prior to the termination of his parental rights, we have held that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). Given petitioner's failure to acknowledge the conditions of abuse and accept responsibility for his actions, we find that the circuit court did not err in terminating his parental rights.

Lastly, petitioner argues that the circuit court erred in terminating his parental rights when the DHHR failed to file a motion to terminate his parental rights prior to the dispositional hearing. In support of this claim, petitioner cites to Rule 30 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, which provides that

> [a]t least five (5) judicial days prior to the disposition hearing, each party shall provide the other parties, persons entitled to notice and the right to be heard, and the court a list of possible witnesses, with a brief summary of the testimony to be presented at the disposition hearing, and a list of issues of law and fact. Parties shall have a continuing obligation to update information until the time of the disposition hearing.

The text of this rule clearly does not require the filing of a motion to terminate parental rights, as petitioner suggests. Instead, this rule requires the parties to cooperate in an exchange of information, including witnesses and issues of fact and law, prior to the dispositional hearing. Moreover, petitioner does not argue that he was unaware that the hearing was a dispositional hearing or that he was unaware that the DHHR was seeking the termination of his parental rights, and his counsel did not object to proceeding to disposition. Therefore, we find that petitioner is entitled to no relief in this regard.

For the foregoing reasons, we affirm the circuit court's April 5, 2021, order.

Affirmed.

**ISSUED**: April 18, 2022


**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice Alan D. Moats sitting by temporary assignment


WOOTON, Justice, concurring:


I respectfully concur in the majority's decision to affirm the circuit court's order terminating petitioner father J.J. Jr.'s parental rights to his children, C.J.-1, C.J.-2, C.J.-3, and R.J. I write separately to address the petitioner's argument that the circuit court erred in failing to enter an adjudicatory order in this case.

9

The majority holds that that petitioner is not entitled to any relief, notwithstanding the court's failure to enter an adjudicatory order, because he made "detailed (if unavailing) arguments" in his brief disputing the court's basis for adjudicating him as an abusing parent. In reaching this conclusion, the majority reasons that because petitioner's arguments "demonstrate no uncertainty as to the grounds for the circuit court's decision to adjudicate him as an abusing parent[,]" he never "lacked understanding of the court's rationale at adjudication" and, therefore, is not entitled to relief.

Let there be no mistake, the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings provide no support for the proposition that so long as a petitioner can make "detailed" arguments in support of his position concerning adjudication, the court's failure to enter an adjudicatory order provides no ground for relief. Rather, the issue – and a straightforward one, at that – is whether the circuit court compiled with Rule 27 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings. In this regard, Rule 27 expressly provides that "[a]t the conclusion of the adjudicatory hearing, the court shall make findings of fact and conclusions of law, *in writing or on the record*, as to whether the child is abused and/or neglected in accordance with W. Va. Code § 49-4-601(i)." (Emphasis added).

In this case, the circuit court strictly complied with Rule 27.[5] Despite the fact that no apparent order was entered reflecting petitioner's adjudication, the circuit court appropriately made the required factual findings on the record, as expressly allowed under the rule. Specifically, the circuit court found that the evidence demonstrated that petitioner committed a physical assault on the child, causing bruising to his neck, face, hip, back, and buttocks and considered petitioner's failure to testify as affirmative evidence of his culpability. The majority's analysis of whether the arguments in petitioner's brief demonstrated uncertainty or lack of understanding on his part is wholly unnecessary, and complicates what should be a straightforward issue

For the foregoing reasons, I respectfully concur.

---

[5] For the avoidance of doubt, it would behoove circuit courts to enter adjudicatory orders memorializing their findings of fact and conclusions of law in abuse and neglect proceedings.